## B. J. BRADY v. STATE.

No. A-6162. Opinion Filed June 9, 1928.
(267 Pac. 317.)

Morris & Tant, for plaintiff in error.

George Short, Atty. Gen., and J. Berry King, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error, hereinafter called the defendant, was convicted of the crime of maintaining a nuisance in a building located at 1019 East Seventeenth street, in Oklahoma City, by operating a building in the manner and form as follows, to wit:

"That is to say, that the said defendant in the county and state aforesaid, on the day and year aforesaid, then and there being, did then and there willfully unlawfully, and wrongfully maintain and operate the west apartment of a duplex frame building located at 1019 East Seventeenth street, in Oklahoma City, said county and state, where intoxicating liquors, to wit, whisky, was kept, bartered, manufactured, sold, given away, and otherwise furnished to divers persons unknown, and where divers persons unknown were permitted to congregate for the purpose of buying, drinking, and otherwise receiving intoxicating liquors—all to the common nuisance of the public, contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the state of Oklahoma."

—and his punishment fixed at a fine of $500 and confinement in the county jail for 180 days. Motion for new trial was filed and overruled; exceptions saved; and the defendant has appealed to this court.

The testimony on behalf of the state is in substance as follows: Harry Gerson, called as a witness, stated:

That on the 29th day of October, 1924, he owned a duplex building located at 1019 East Seventeenth street, Oklahoma City, Okla. That he had only met one man by

the name of Brady who occupied the building. "I went out to see who collected the rent, and learned that a man by the name of Gilliland had collected the rent a day or two before. I talked to Brady about that part of the building he occupied, and he said the other man worked at night. I afterwards went there. The month I got possession of it a real estate man went out there to show it, and could not get in, and came to me, and said he could not sell it because it had a peculiar odor; and to investigate it I went out with Mr. Mee. I went to the back of the apartment, and found it had a horrible odor."

Mr. Morris objected to the testimony, for the reason that he did not have a search warrant, and that he had no more authority as a private citizen than an officer had to enter the premises, and for that reason they moved that the testimony be excluded. The court overruled, and Mr. Morris excepted.

"Q. Go ahead. A. Victor Mee and I went out there, and discovered this odor, and walked in the back room, and the back door was locked. (Mr. Morris then objected to the witness testifying on the ground that they were trespassers and had no authority to go in to a private home any more than a state, county, or federal officer would have without a search warrant.)

"The Court: I am inclined to believe this is true.

"Mr. Herrod: This man did not go to search the house, but to find out why he could not show it to prospective buyers. He had it for sale. He went there to see why he could not sell his property like is done all over town. He wasn't searching the place; he wasn't asking permission to search.

"The Court: You might ask a further question:

"Q. What did you go out there for? A. The agent who had this house for sale reported to me that he could not get in, and that it had a peculiar odor, and that he could not show it or sell it for that reason."

The witness further testified:

"I said I went out there to investigate and see what was the matter.

"Mr. Morris: The same objection. Does the court want to hold that a private citizen can go on another private citizen's premises and make an investigation when an officer cannot do the same?

"The Court: The evidence is that he or his agent could not get admission out there, and that he went out there to see what was the matter. The objection is overruled.

"Mr. Morris: Exceptions."

Witness testified further:

That in a little back room called a breakfast room there were four or five barrels of mash; about 50 gallon barrels. In the kitchen they discovered a still. There was a worm, acetylene lamp, or gas burner, and copper still. It was a pretty good sized one. "I don't know, it held 20 gallon or more, something like that. The mash was whisky mash. The odor of whisky was pretty strong. We could not get in from the front to where the mash and whisky was. We got in from the back porch on the duplex to where the whisky was. I notified the officers, and they came out and took possession. I only saw Mr. Brady twice after that. After this I served notice on his wife to vacate the premises."

On cross-examination the witness stated:

"It was corn mash. We did not find any whisky there. I went into the west side of the apartment. The duplex is 1017 and 1019 East Seventeenth street. It faces south. There is a partition running through the center and on the front porch. The apartments are separate also from the back porch. I went in from the back way. The still and things were in the kitchen. We could not go from the kitchen into the dinning room on account of the barrels. We did not go into the east apartment at that time: later we did. We never saw any-

thing in there. The east apartment is the apartment occupied by Mr. Brady. That is what he paid rent on. Brady was not there that day. J. D. Johnson was not there that night. I saw Mrs. Johnson. Mrs. Johnson came in that night, and said she occupied the house, and we asked if it was her liquor, and she said that it was. She did not come in the room where the whisky was."

T. H. Gilliland testified:

That he owned the duplex at 1017-1019 East Seventeenth street; that his receipt showed that on September 30, 1924, he rented 1017 East Seventeenth street to Joe Brady. "Mr. Brady did not pay the money at all. A Mr. Sprague brought the money up to me, and I wrote the name 'Joe Brady' in the receipt. I did not see Mr. Brady at all that time. B. J. Brady on the same afternoon rented 1019 East Seventeenth. He came in person. 1019 is the east apartment. The other man who brought the money up was a cripple. He said he was renting it for Joe Brady. I never saw the man who claimed to have been renting it, only the man who brought the money. I never did see the defendant before he come up and paid me the money for the east apartment."

J. D. Johnson testified that he was prosecuted for maintaining a public nuisance at 1017 East Seventeenth street, and the jury returned a verdict against him, fining him $300 and imprisonment in the county jail for six months; that he only occupied two of the front rooms at 1017 East Seventeenth street; that it was in the west apartment that he had rooms rented, only two rooms; that he could not get from his apartment back to the dining room and breakfast room. The doors between the breakfast room and dining room and the room he occupied were locked. He stated:

He could smell the odor of whisky strong. He did not know what defendant Brady was doing at that time. He did not talk with him after the raid; did not see him until they had him arrested down at Dodge Bros. "My wife and I drove up to the apartment that night

while the officers were there. She went in the house, and I ran off. I later came in and surrendered."

On cross-examination witness Johnson testified that, when the door was opened, and he saw the light and saw the officers, and he saw where they were, he knew they would arrest him for having a still and mash in the building. He admitted he had been tried and convicted for the same offense as was charged against the defendant; that he had not been sentenced on the verdict of the jury; that they were waiting until the Brady matter was tried, and then to pass on them. Later he said there was not anything said about waiting until the Brady Case was tried before passing on the motion.

Witness Johnson stated that he did not have the use of the toilet in the apartment he occupied; used the Brady toilet; did not have a key to the Brady apartment, but they were always home at night. Witness stated that Brady used his car the afternoon previous, and that Brady bought a car and left witness' car at the garage; that the the witness did not know there were any bottles in the car.

Defendant called witness J. F. Burks, who testified: That he was deputy sheriff. That he had a phone call to come out to a certain place, and that he found Bill Shelton in charge of the house. There was a lady there supposed to be Johnson's wife. She gave her name as Johnson. This lady said that the still and mash were hers—hers and her husband's. That he testified in the case against J. D. Johnson and his wife. Mrs. Brady was in the east apartment. There was a solid wall between the apartments.

On cross-examination witness stated:

That Mrs. Johnson came in where the mash was, "and, somehow, I don't know just how it was, I found out it was the woman of the house, and she said it was

their still and, if my memory serves me right, she said it was the third time they run it. She mentioned no one else excepting her husband."

U. S. Grant, a deputy sheriff, testified as to the same facts as J. F. Burks; also:

That they found five or six empty bottles and two packages of yeast in the Johnson car. He went through the Brady apartment, and saw nothing to indicate liquor. Mrs. Johnson came into the room, and was talking to Mr. Gerson and his wife. "I asked whose stuff it was, and she said it was ours; she said, 'Mr. Johnson's and mine.' I testified in the case against Mr. Johnson."

On cross-examination he was positive Mrs. Johnson said the still and mash was her husband's.

The defendant, called as a witness in his own behalf, stated:

That he did not remember the date he was arrested, but when he was arrested he lived at 1019 East Seventeenth street, which was a duplex apartment. That his apartment was the east apartment of the duplex; that he had nothing to do with the still or mash found in 1017, which is the west apartment, nor did he know anything about it. That Mr. Johnson never paid him any money to pay for the gas meter, nor did he pay for the same. He rented apartment 1019 from Mr. Gilliland. Mr. Gerson left a notice with his wife to vacate. At the time his wife was working at Classen Junior High. That the children were going to school. There was no way for him to go from his apartment to the west apartment without going outside the building. There was a partition wall running all the way across the porch. "Johnson did not use any part of my apartment, and I did not use any part of his. They did not use my car, nor did I use their car. I never did drive his car. I did not run off the night of the raid. I was at Cromwell, Okla., at that time. I did not tell Mr. Gerson that I rented the whole house. I told him I rented the east apartment. I am now working in Guthrie."

Several pages of the record are taken up with the state in cross-examination of the defendant. Considerable time is consumed in asking the defendant as to what he had been doing prior to the date of his arrest and for some time thereafter. Many of the questions are incompetent and immaterial, and had a tendency to lengthen the record unnecessarily. However, none of the questions propounded are of such a character as to prejudice the rights of the defendant before the jury.

The defendant has assigned twelve errors alleged to have been committed by the court in the trial of his case. The only errors we deem necessary to consider are 5 and 12, which are as follows:

"(5) That the verdict of the jury is contrary to the law and to the evidence."

"(12) Because the court erred in overruling the motion for new trial."

These two assignments of error cover all the questions raised by the defendant. The information in the case charges the defendant with having maintained a nuisance at apartment 1019 East Seventeenth street. All of the proof shows conclusively that there was no nuisance of any kind or character committed at apartment 1019 East Seventeenth street. The only testimony introduced tends to establish that a nuisance, if any committed, was committed at 1017 East Seventeenth street, which was the adjoining apartment, there being only a wall between 1017 and 1019 East Seventeenth street. The testimony tends to show that the defendant in this case personally rented from the party having the authority to rent the building at 1019 and paid the rent. The testimony is not clear as to who rented the apartment at 1017; the witness for the state saying that some one who was crippled applied to rent it, and paid the rent, and he wrote the receipt in the name of Joe Brady; that

he had never seen Joe Brady; and that he did not know who he was. There is no testimony to show that such a person as Joe Brady existed, but the testimony does show that B. J. Brady applied in person and rented apartment 1019 East Seventeenth street.

The record further discloses that there is no proof showing that the defendant in this case knew of there being a still and barrels of mash in the apartment No. 1017, except the testimony of J. D. Johnson, who, together with his wife, had been tried and convicted of having maintained a nuisance at 1017 East Seventeenth street. The testimony further discloses that, while the officers were at 1017, and while Mrs. Johnson, the wife of J. D. Johnson, was present, she stated that the still and the mash belonged to her and her husband, and that this was the third time they had run it; that she and her husband had been getting something to eat, and they drove up to the house and saw the officers in there, and her husband ran off; that in his car were found some bottles and yeast.

The record further discloses from the witness J. D. Johnson that his motion for a new trial in the case of himself and his wife, where they had been convicted for maintaining a nuisance at 1017 East Seventeenth street, had not been disposed of; that he had been told that it would not be until after the trial of Brady. He then later changed his statement, and says nothing of that kind had been said to him.

The only evidence in the record which tends to show that the defendant was in anyway whatever connected with apartment No. 1017 East Seventeenth street and the still and mash they found in the apartment is the statement of J. D. Johnson, who has been convicted of the same offense charged against this defendant. There is no other testimony tending to show that the defendant had any thing to do with 1017, excepting the uncor-

roborated testimony of J. D. Johnson, whose statement shows he is an accomplice with the defendant. All of J. D. Johnson's evidence tends to show that it was given against the defendant for revenge.

The court in its sixth instruction advised the jury as to the witness J. D. Johnson being an accomplice, and correctly instructed the jury upon the law as applied to an accomplice.

Section 2701, C. O. S. 1921, is as follows:

"A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

This court, in McKinney v. State, 20 Okla. Cr. 134, 201 P. 673, says:

"It is not sufficient corroboration to merely connect the defendant with the accomplice in a crime. The evidence, independent of the testimony of the accomplice, must tend to connect the defendant with the crime itself, and not simply with the perpetrators."

In Kirk v. State, 10 Okla. Cr. 281, 135 P. 1156, it is held:

"There cannot be a conviction unless there is proof of substantial facts tending to connect the defendant with the commission of the offense aside from and without the aid of the accomplice testimony." Wever v. State, 22 Okla. Cr. 414, 211 P. 1062.

This question has been before this court in so many cases that it is not deemed necessary to cite further authorities upon that question. The court is of the opinion that the evidence of J. D. Johnson is that of an accomplice, and, if this conviction is allowed to stand, it is necessary to find in this record evidence independent of the witness

J. D. Johnson, which connects the defendant with the commission of the offense.

After a careful examination of the entire record, the court is of the opinion that there is no evidence independent of that of the accomplice which tends in any way to connect the defendant with the commission of the offense charged. Therefore it is our opinion that the evidence is legally insufficient to sustain the conviction.

For the reason stated, the judgment is reversed and remanded.

DOYLE, P. J., and EDWARDS, J., concur.